FRED BIERY, UNITED STATES DISTRICT JUDGE
Before the Court are: (1) Defendants' Motion to Dismiss Plaintiff's Second Cause of Action Under Rule 12(b)(1) filed by JPMorgan Chase Bank, N.A. and Deutsche Bank National Trust Company (hereinafter JPMC and DBNTC defendants) (docket # 10); (2) Plaintiff's Response and Opposition to Rule 12(b)(1) Motion to Dismiss filed by JPMorgan Chase Bank, N.A. and Deutsche Bank National Trust Company f/k/a Bankers Trust Company of California, N.A., as Trustee for Long Beach Mortgage Loan Trust 2001-1 (docket # 18); (3) Defendants' Reply in Support of Their Motion to Dismiss Plaintiff's Second Cause of Action Under Rule 12(b)(1) (docket # 19); (4) Defendant Mortgage Contracting Services, LLC's Motion to Dismiss Pursuant to Rule 12(b)(1) (docket # 24); (5) Plaintiff's Response and Opposition to Rule 12(B)(1) Motion to Dismiss Filed by Mortgage Contracting Services, LLC (docket # 26); and (6) Defendant Mortgage Contracting Services, LLC's Reply in Support of Its Motion to Dismiss Pursuant to Rule 12(b)(1) (docket # 29). At issue in these motions is whether this Court has jurisdiction over plaintiff's second cause of action (Count II) which claims a violation of 50 U.S.C. § 3953 (Servicemembers Civil Relief Act or SCRA) by all three of the defendants.[1]
Title 50 U.S.C. § 3953 provides in part:
(a) Mortgage as security
This section applies only to an obligation on real or personal property owned by a servicemember that- *750 (1) originated before the period of the servicemember's military service and for which the servicemember is still obligated; and
(2) is secured by a mortgage, trust deed, or other security in the nature of a mortgage.
(c) Sale or foreclosure
A sale, foreclosure, or seizure of property for a breach of an obligation described in subsection (a) shall not be valid if made during, or within one year after, the period of the servicemember's military service except-
(1) upon a court order granted before such sale, foreclosure, or seizure with a return made and approved by the court, or
(2) if made pursuant to an agreement as provided in section 3918 of this title.
Plaintiff contends that "[a]t no time have any of the Defendants filed an action in a court of competent jurisdiction seeking authority to seize the Property of Plaintiff, nor have any of the Defendants obtained a valid court order approving and authorizing the seizure of the Property." Complaint, docket # 1 at page 12. Defendants assert this Court lacks jurisdiction over this claim pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) because the defendants "acquired the mortgage loan at issue from the FDIC, as receiver for Washington Mutual Bank, and Plaintiff has not exhausted the administrative claims process with the FDIC." Defendants' Motion to Dismiss, docket # 10 at page 1-2; see Defendant Mortgage Contracting Services, LLC's Motion to Dismiss, docket # 24 at page 2 (FIRREA "bars any court from subject matter jurisdiction over any claim relating to an act or omission of an institution for which the FDIC acted as receiver without first going through the FDIC administrative claims process" which plaintiff has not done). Plaintiff responds by asserting that the "allegations of Count II of the Complaint sufficiently allege post-purchase misconduct of JPMC [and its contractor-agent MCS][2] to confer federal question jurisdiction on this Court by virtue of the allegations of a violation of the Servicemembers Civil Relief Act ("SCRA") and specifically 50 U.S.C. 3953." In reply, defendants point out the plaintiff has conceded he has not filed an administrative claim with the FDIC and because plaintiff's allegations concerning the seizure of his property originated with Washington Mutual Bank, a failed bank placed in receivership with the FDIC, the administrative requirements of FIRREA cannot be avoided, and thus, this Court lacks jurisdiction over plaintiff's second cause of action.
Background
According to the complaint, plaintiff and his then-wife, Deborah A. Ruman, purchased real property in San Antonio on January 19, 2001. Plaintiff was not on active military duty at that time. Plaintiff and his then-wife executed a promissory note secured by a deed of trust in favor of S.A. Sterling Group, Inc. The deed of trust was subsequently assigned at various times to several different servicing companies, and ultimately JPMC "took over servicing the Deed of Trust in 2009 from Washington Mutual Bank "WaMU")." Complaint, docket # 1 at page 4. Currently, defendant DBNTC holds the Deed of Trust.
The United States Air Force called plaintiff to active military duty beginning *751 on January 1, 2002. Plaintiff submitted to WaMu his written demand for protection under the SCRA along with a copy of his military orders. In 2003, plaintiff was still on active military duty when he entered into a payment arrangement with the Bexar County Tax Assessor-Collector to bring the taxes on his property current through monthly payment installments, which plaintiff paid on a timely basis. Despite this payment arrangement with the Bexar County taxing authority and the fact "he was essentially protected from tax foreclosure by 50 U.S.C. § 3991 after he began a period of active military duty, WaMu proceeded to initiate foreclosure proceedings on the Property and paid the entire amount of outstanding taxes on August 30, 2003." Id. at page 5.
On September 11, 2003, WaMu, by written correspondence, notified plaintiff it was initiating foreclosure proceedings based on the deed of trust. Although plaintiff opposed that action, WaMu refused to allow plaintiff to refinance his obligation with a VA guaranteed loan and insisted that the loan be paid in full immediately, including the lump sum WaMu had needlessly prepaid to Bexar County for the property taxes despite plaintiff's payment arrangement, despite the fact that the loan itself was current. In November of that same year, WaMu, through its attorneys and agent, sent a written Notice of Acceleration and Notice of Posting & Foreclosure to the plaintiff and on that same date, also sent a Notice of Trustee's Sale setting forth a sale date of December 2, 2003. Plaintiff was advised by both WaMu and its attorneys, in response to his inquiry, that "he and his family had to vacate the Property because it was about to be sold at a trustee's sale and that there would only be a period of seven days after the trustee's sale on December 2, 2003 in which he would be allowed to remove his personal property and belongings from the Property before the locks would be changed." Id. at page 6. Plaintiff relied on the notices and information received from WaMu and its attorneys, and moved out of the property on December 8, 2003. Plaintiff asserts that at no time did WaMu or its attorneys/agents obtain a court order "authorizing the foreclosure, sale or seizure of the Property." Id.
The December 2, 2003, trustee's sale did not occur, and because plaintiff's access to his electronic account with WaMu was blocked, plaintiff was unaware the sale had not happened. WaMu at some point in time, the exact is date is unknown,
engaged the services of Defendant MCS [Mortgage Contracting Services, LLC] to change the locks on the doors to the Property and post notices of its seizure on the inside of windows and inside panes of the glass in doors. No court order was ever obtained authorizing the seizure of the Property or the changing of the locks on the doors of the Property, either before or after the seizure of Plaintiff's Property.
Id. at 6-7. Plaintiff contends defendant MCS, from December 2003 to the present, based on the orders of WaMu and thereafter JPMC, inspects, maintains, and continues to keep locks on the doors of his property. Also during this same time period, WaMu and thereafter JPMC have paid the property taxes and have placed and renewed insurance on the property.
Plaintiff was protected by the SCRA until August 1, 2017, one year after his separation for active military duty, from the "sale, foreclosure or seizure of real property, unless the seizing creditor had first obtained a valid court order authorizing the seizure."Id. at page 7. Plaintiff asserts no valid court order authorizing the seizure was ever obtained, a trustee's sale never took place, and the property *752 was seized, first by WaMu and then by defendant JPMC and the seizure continues.
Standard of Review
A motion filed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party "to challenge the subject matter jurisdiction of the district court to hear a case." Ramming v. United States , 281 F.3d 158, 161 (5th Cir. 2001). Before this Court may consider any other challenge or validity of any claim, it must consider a challenge to its lack of jurisdiction under rule 12(b)(1) of the Federal Rules of Civil Procedure. Baker Hughes Inc. v. BNY Mellon Capital Markets, LLC , No. H-09-CV-1466, 2010 WL 985826 (S.D. Tex. Mar. 16, 2010). As the Baker Hughes court explained:
Since federal courts are considered courts of limited jurisdiction, absent jurisdiction conferred by statute, federal courts lack the power to adjudicate claims. Therefore, the party seeking to invoke the jurisdiction of a federal court carries the burden of proving its existence.
In reviewing a motion to dismiss for lack of subject matter jurisdiction, a district "court is free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case." It may base its disposition of such a motion on any of the following "(1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." In this regard, "no presumptive truthfulness attaches to the plaintiff's allegations, and the court can decide disputed issues of material fact in order to determine whether or not it has jurisdiction to hear the case." Nevertheless, the burden of proof that jurisdiction does exist remains with the plaintiff.
Id. at *3 (Citations and headings omitted); see Ramming , 281 F.3d at 161 ("lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts"; "plaintiff constantly bears the burden of proof that jurisdiction does in fact exist").
Motions to Dismiss
Here, the defendants maintain as to the second cause of action that this Court lacks subject matter jurisdiction because plaintiff concedes he did not file an administrative claim with the FDIC concerning the seizure of his property by WaMu in violation of the SCRA. Defendants assert the plaintiff has not alleged that any of the defendants herein seized his property but rather that they continued WaMu's seizure or acted initially in accordance with the orders of WaMu in the case of defendant MCS and then continued those actions until the present.
In his response, plaintiff acknowledges his concession that he has not filed any administrative claims against the FDIC for the SCRA violations by WaMu prior to JPMC purchasing WaMu from the FDIC after WaMu failed in 2008. However, plaintiff contends he has alleged sufficient independent post-acquisition conduct of the defendants to justify subject matter jurisdiction in this case. Specifically, plaintiff references paragraphs 22, 23, 25, and 26 of his complaint which provide as follows:
22. On information and belief, and on showing that signs bearing the name and telephone numbers of Defendant MCS are still posted on the doors of the *753 Property, Plaintiff alleges that MCS, at the orders initially of WaMu and thereafter Defendant CHASE [JPMC herein], has on some routine basis inspected the Property, maintained the Property and continued to keep locks on the doors of the Property to which Plaintiff has had no keys, from December 2003 until the present.
23. Beginning in 2003 and continuing to the present, first WaMu and thereafter Defendant CHASE paid the property taxes on the Property and placed insurance on the Property with insurance companies at exorbitantly high premium rates, despite the fact the WaMu had ordered Plaintiff out of the Property and had told him it would be sold at a trustee's sale on December 2, 2003.
25. In compliance with the SCRA's requirement, Plaintiff supplied to either WaMu or Defendant CHASE copies of the extensions of his active duty orders each time such orders were published. However, WaMu and Defendant CHASE failed to comply with the requirements of the SCRA and charged interest on the obligation secured by the Deed of Trust at interest rates above 6% per annum and added fees and charges not authorized by the SCRA.[3] The Defendants also continued to place insurance on the Property with insurers that charged exorbitantly high premiums and continued the wrongful seizure of the Property.
26. At various times during th period from November 2003 until the present, Plaintiff has been contacted, first, by representatives of WaMu, and, thereafter by representatives of Defendant CHASE, concerning the Deed of Trust debt on the Property. However, because first WaMu and thereafter Defendant CHASE would not or could not compute an accurate payoff figure for the obligation, Plaintiff was unable to sell or re-finance the Property. Furthermore, Plaintiff was unable to rent the Property because WaMu and Defendants CHASE and MCS had locked Plaintiff out of the house when it was seized without the benefit of a valid court order. That wrongful seizure continued after Defendant CHASE acquired the the [sic] Property, Promissory Note and Deed of Trust securing the Property from WaMu, which wrongful seizure continues to this date.
Complaint, docket # 1 at pages 7-8. Plaintiff asserts each of the foregoing acts by the defendants "constitutes a separate and independent act of seizure of the property without first having obtained a valid court order, which is the violation of the SCRA alleged in Court II of the Complaint." Plaintiff's Response and Opposition to Rule 12(b)(1) Motion to Dismiss, docket # 18 at page 3. Plaintiff contends whether these same actions were also taken by WaMu prior to 2008 is irrelevant because JPMC also independently took those same steps "each of which constituted steps in the seizure of the property each and every day that JPMC has serviced the mortgage debt against the property, after it knew the Plaintiff was on active duty in the U.S. Air Force and still never obtained a valid court order authorizing the seizure of the property." Id. These independent actions by the defendants provides the necessary post-acquisition violations of the SCRA in Count II to confer subject matter jurisdiction. In support of his argument, plaintiff relies on Benson v. JPMorgan Chase Bank, N.A. , 673 F.3d 1207 (9th Cir. 2012) ;
*754 Tavake v. JPMorgan Chase Bank , No. 2:12-cv-0041 KJM AC PS, 2013 WL 3332148 (E.D. Cal. Jul. 1, 2013) ; and Coward v. JP Morgan Chase Bank , No. 2:11-cv-3378 GEB AC PS, 2013 WL 618163 (E.D. Cal. Feb. 19, 2013).
In Benson , the plaintiffs were a group of investors seeking recourse against JPMorgan Chase Bank after being defrauded by the " 'Millennium Ponzi scheme.' " Benson v. JPMorgan Chase Bank, N.A. , 673 F.3d 1207, 1208 (9th Cir. 2012). Plaintiffs alleged Washington Mutual, Inc. aided and abetted this scheme "by providing banking services to several companies controlled by the scheme's principals despite actual knowledge of the fraud." Id. at 1209. As the successor in interest of WaMu, plaintiffs contended JPMorgan was liable based on its purchase of most of the assets and liabilities of WaMu from the FDIC. Additionally, plaintiffs claimed JPMorgan was liable due to its continuation of "WaMu's problematic practices following assumption." Id.
The district court dismissed plaintiff's claims based on their failure to exhaust FIRREA's administrative remedies. In affirming the district court's dismissal, the Ninth Circuit joined three other circuits which had already concluded that "a claim asserted against a purchasing bank based on the conduct of a failed bank must be exhausted under FIRREA." Id. The court went on to explain that the same would not be true for claims "based on a purchasing bank's post-purchase actions." Id. After making that assertion, the court determined that assertion had no applicability to the case at bar because plaintiffs failed to adequately plead a claim based on the alleged independent conduct of JPMorgan but instead relied on conclusory allegations.
In reaching this conclusion, the Ninth Circuit provided the following analysis:
Plaintiffs' complaints are based almost exclusively on alleged malfeasance by WaMu. They claim that WaMu knowingly provided banking services-including allowing the Nevada LLCs to utilize CMT and RDC systems-despite its actual knowledge of the Millennium Ponzi scheme. They argue that JPMorgan is liable for this conduct because it assumed WaMu's liabilities pursuant to a purchase and assumption agreement with the FDIC. By relying on WaMu's alleged wrongdoing, plaintiffs' claims plainly "relat[e] to any act or omission' of "a depository institution for which the [FDIC] has been appointed receiver." And because plaintiffs did not exhaust administrative remedies, their claims are jurisdictionally barred by FIRREA.
Plaintiffs also contend that the district court erred by dismissing the portions of their claims based on JPMorgan's independent activity. In denying plaintiffs' Rule 60(b) motion, the district court held that "although plaintiffs alleged that practices continued after [JPMorgan] acquired WaMu in September 2008, this assertion fell short of transforming Plaintiffs' claims into something other than claims 'relating' to WaMu's alleged misconduct." Moreover, the court held that even if the complaints "include stand-alone allegations of post-receivership misconduct by [JPMorgan], FIRREA still applies" because the phrase "relating to" as used in § 1821(d)(13)(D)(ii) "has a deliberately broad and sweeping meaning."
We disagree with the district court's analysis. Claims of independent misconduct by an institution that purchased a failed bank are not covered by FIRREA's exhaustion requirement. We need look no further than the plain language of the statute to reach this conclusion. As relevant to this matter, FIRREA
*755 requires exhaustion of claims "relating to any act or omission of [a failed bank] or the [FDIC] as receiver." If a plaintiff alleges that a purchasing bank aided and abetted a fraudulent scheme following its assumption of a failed bank, that claim simply does not relate to any act or omission of the failed bank or the FDIC..... Because plaintiffs alleged that JPMorgan continued the tortious conduct that WaMu began, the district court ruled that plaintiffs' claims relate to the conduct of WaMu.
This analysis misinterprets the operative language. Although we do not quibble with the district court's conclusion that the phrase "relating to" has a broad meaning, we nevertheless hold that a claim alleging liability based only on post-purchase misconduct of a purchasing bank would not "relate to" acts or omissions of a failed bank for purposes of FIRREA. The fact that JPMorgan acted in a manner that was similar, or even identical, to the manner in which WaMu acted, does not alter our conclusion. The acts of the purchasing bank might be related to the acts of the failed bank, but FIRREA's jurisdictional bar applies when a claim relates to the acts of a failed bank. Purchase of a failed bank does not buy an institution immunity to continue in its predecessor's malfeasance.
Id. at 1215-16 (citations omitted, emphasis in original). The court then found plaintiffs had failed to adequately state claims against JPMorgan that would avoid FIRREA's exhaustion requirements. The court noted the sole allegation against JPMorgan was that "unidentified 'practices continued' after acquisition; but plaintiffs failed to "allege a single specific act taken by the purchasing bank." Id. at 1217.
The other cases cited by the plaintiff, Tavake v. JPMorgan Chase Bank , No. 2:12-cv-0041 KJM AC PS, 2013 WL 3332148 (E.D. Cal. Jul. 1, 2013) ; and Coward v. JP Morgan Chase Bank , No. 2:11-cv-3378 GEB AC PS, 2013 WL 618163 (E.D. Cal. Feb. 19, 2013), acknowledge the Benson decision as a clarification that FIRREA's jurisdictional bar applies to claims against:
(1) failed banks; (2) the FDIC, acting as the receiver for a failed bank; and (3) "a purchasing bank when the claim is based on the conduct of the failed institution." However, the Court of Appeals held that '[c]laims of independent misconduct by an institution that purchases a failed bank are not covered by FIRREA's exhaustion requirement.
Tavake , 2013 WL 3332148, at *6 ; Coward , 2013 WL 618163, at *5. In Tavake , plaintiffs alleged JPMorgan was liable for the allegedly fraudulent conduct of WaMu employees committed prior to JPMorgan's acquisition of WaMu. Without an additional explanation, the court after setting forth the Benson holding, found a lack of jurisdiction for failure to exhaust the administrative remedies required by FIRREA. Likewise, in Coward , FIRREA's exhaustion requirement was also applicable because the forged signature at issue occurred before Chase purchased WaMu and therefore the claim was found to be premised upon WaMu's conduct. Coward , 2013 WL 618163, at *5.
Defendants in reply argue plaintiff cannot avoid the administrative exhaustion requirements under FIRREA because the alleged seizure of the property at issue in Count II originated, without question, with WaMu, a failed bank placed in receivership with the FDIC. This exhaustion requirement is not limited only to WaMu's conduct because 12 U.S.C. § 1821(d)(13)(D)"strictly limits judicial review of 'any claim relating to any act or omission of such [failed lending] institution. ' " Defendants'
*756 Reply, docket # 19 at page 2 (emphasis in original). Defendants assert the sole question this Court must answer is "whether the Defendants' alleged seizure of the Property under the Servicemembers Civil Relief Act ("SCRA"), 50 U.S.C. § 3953, 'relates to' acts taken by Washington Mutual Bank ("WaMu')." Defendants contend it does.
In addition, defendant MCS contends plaintiff's reliance on the Benson decision is misplaced. Its actions of continuing to keep the locks on the doors of the property from December 2003 until the present is not a claim of independent misconduct. Plaintiff's claim is not based solely on post-purchase misconduct as plaintiff cannot make a claim against MCS without discussing the prereceivership conduct of WaMu. As such, plaintiff's claims are "inextricably linked to the actions initiated by WaMu when it allegedly seized the property in 2003, which was several years before JPMorgan Chase Bank ever acquired the loan." Defendant's Reply, docket # 29 at page 2. MCS believes the cases of SunSouth Bank v. First NBC Bank , 678 F. App'x 811 (11th Cir. 2017) ; Tellado v. IndyMac Mortg. Servs. , 707 F.3d 275 (3rd Cir. 2013) ; and Tri-State Hotels, Inc. v. F.D.I.C. , 79 F.3d 707 (8th Cir. 1996), support its position.
In Tri-State Hotels , the plaintiff, like the plaintiff in the instant case, did not submit its claims to the FDIC for formal review. Tri-State Hotels argued the jurisdictional bar was not applicable because its claims "arose postreceivership, as a result of management decisions made by the FDIC, and so the claims are not covered" by the administrative review process. Tri-State Hotels , 79 F.3d at 712. Although Tri-State Hotels conceded the breach of contract and fraud allegations underlying the lawsuit happened prior to the time the FDIC took over as receiver, it asserted "its claims arose only after the FDIC, as receiver, refused to honor the refinancing agreements," and it was only "challenging the management decisions of the FDIC (that the FDIC, in managing the failed banks, did not remedy the breach of contract and fraud and did not honor the loan obligations)." Id. at 713. In rejecting Tri-State Hotels' argument, the Eighth Circuit court found the "genesis of [Tri-State Hotel's] claim is the prereceivership misconduct by the failed banks" and the "actions taken by the FDIC as receiver cannot be separated from the underlying prereceivership misconduct by the failed banks."[4] Id. As a result, Tri-State's claims were required to be submitted for administrative review. Id. at 713-14.
The Third Circuit Court of Appeals in Tellado v. IndyMac Mortg. Servs. , came to a similar conclusion as did the Eight Circuit concerning exhaustion. In that case, IndyMac made a loan to couple who primarily spoke Spanish and who had communicated with IndyMac's representatives in Spanish but were given all documents in English when they closed on their loan to *757 refinance their home. IndyMac subsequently failed and eventually the plaintiffs' loan was transferred by the FDIC to OneWest. A month after the transfer, the plaintiffs sent a notice to One West that they were seeking to cancel the loan in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Laws. Tellado , 707 at 277-78,. They additionally notified OneWest they intended to file suit if OneWest did not respond to them within ten days. After they did not receive a response, the plaintiffs filed suit seeking a "determination that their loan was void and that OneWest had forfeited the right to any further payment or, in the alternative, seeking triple damages based on the amount of payments they had made on the loan or on the amount of the security interest retained in their home." Id. at 278. Following a bench trial, the court ruled in the plaintiffs' favor finding IndyMac had not provided plaintiffs the proper notice in Spanish and therefore, their three-day right of recission had not begun to run. The court further found plaintiffs' notice to OneWest was effective and binding and ordered OneWest to refund payments, terminate the security interest in plaintiffs' property, and return any negotiable instruments executed as a part of the loan.
On appeal, OneWest successfully argued the district court lacked subject matter jurisdiction over the plaintiffs' claim pursuant to FIRREA because the claim was "predicated upon an act or omission of IndyMac specifically IndyMac's failure at closing to provide notice in Spanish of the right to cancel." Id. at 279-80. Referencing the Ninth Circuit's decision in Benson , relied upon by the plaintiffs herein, the court found the Tellados' claim to be "functionally, albeit not formally, against Indy Mac." Id. at 280. The court explained:
The Tellados characterize their claim as a claim against OneWest for its own misconduct, pointing to OneWest's failure to cancel the loan in response to the Tellados' August 2009 notice of cancellation. However, as the District Court correctly held, the Tellados' notice of cancellation was valid only because IndyMac had failed to provide proper notice of the right to cancel and as a result the cancellation period had not begun to run. Without IndyMac's wrongdoing, the Tellados would have no right to cancel and therefore no claim. Thus, the Tellados' claim is not a claim of independent misconduct by OneWest, rather, it relates to an act or omission of the depository institution, IndyMac, and is, therefore, jurisdictionally barred under section 1821(d)(13)(D)(ii).
Id.
Finding the applicability of § 1821(d)(13)(D) turns on " 'the actor responsible for the alleged wrongdoing' " and not depending upon "which party the plaintiff happened to bring the case against," the Eleventh Circuit found Tri-State Hotels, Inc. v. F.D.I.C. decision instructive. SunSouth Bank v. First NBC Bank , 678 F. App'x 811, 813 (11th Cir. 2017). As in Tri-State Hotels , the conduct complained of by SunSouth bank had its genesis in the "alleged prereceivership conduct by the failed bank." Id. at 814. The now-failed bank, Central Progressive Bank, made three loans to Mississippi Investors VI, LLC. Loan 1 was secured by property in Mississippi for which Central Progressive was given a security interest which was subordinate to that of Double A. Firewood, Inc. Loans 2 and 3 provided first lien priority on property known as " 'Villages D and E.' " Id. at 812. Based on these loans, SunSouth entered into a participation agreement with Central Progressive. After the Mississippi Investors defaulted, SunSouth and Central Progressive spent months disputing Central Progressive's obligations to SunSouth under their *758 agreement and before they could be resolved, Central Progressive failed and the FDIC was appointed the receiver. Id. at 812-13. The FDIC transferred all of Central Progressive's assets to First NBC. Although First NBC was able to resell the collateral from Loans 2 and 3, it refused to remit to SunSouth any of the sale proceeds even though had a participation interest in the loans. First NBC then assigned to HCB its rights in Loans 2 and 3. Id. at 813. Based on the exhaustion requirement of FIRREA, the district court dismissed the case for lack of jurisdiction. SunSouth contended the exhaustion requirement did not apply because it was asserting breach of contract claims against First NBC and HCB. Id.
In affirming the district court's decision, the circuit court found the genesis of SunSouth's claims arose when "Central Progressive informed SunSouth that Central Progressive would no longer honor the Participation Agreement because SunSouth refused to help purchase the Double A. Firewood loan," i.e. "alleged prereceivership misconduct by the failed bank." The court noted that if it allowed SunSouth to "circumvent the exhaustion requirement by claiming that First NBC and HCB failed to cure Central Progressive's breach would defeat the purpose of the requirement," an invitation they declined to accept. Id. at 814. Because Central Progressive was the actor responsible for the alleged wrongdoing," "SouthSun's claims are 'claims relating to an[ ] act or omission' by a failed bank for which the FDIC was appointed receiver, and the claims are subject to administrative exhaustion." Id.
Also relying on the Tri-State Hotels and SunSouth opinions, defendants JPMC and DBNTC contend plaintiff's seizure claim raised against them in Count II is based upon their alleged failure to remedy the alleged wrongdoing by WaMu. Noting the plaintiff does not seek the return of this property, plaintiff alleges JPMC and DBNTC "failed to advise him that a foreclosure sale had not taken place and continued to maintain the Property after WaMu changed the locks." Defendants' Reply, docket # 19 at pages 3-4. Plaintiff also takes issue with JPMC and DBNTC paying the taxes and insurance on the property " 'despite the fact that WaMu had ordered Plaintiff out of the Property and had told him it would be sold at a trustee's sale on December 2, 2003.' " Id. at 4 (Emphasis in the original.) It was WaMu's alleged actions in 2003, i.e. ordering plaintiff out of the property and changing the locks, that resulted in the alleged seizure not actions of JPMC and DBNTC who "merely continued to protect their collateral and lien after WaMu was placed in receivership in 2008." Id. Defendants maintain that because WaMu's prereceivership conduct is the genesis of plaintiff's claim, it is barred for failure to exhaust "regardless of the Defendants' alleged failure to remedy WaMu's alleged misconduct." Id. As additional support for its motion, defendants JPMC and DBNTC find the case of Lazarre v. JPMorgan Chase Bank, N.A. , 780 F.Supp.2d 1320 (S.D. Fla. 2011), closely resembles the facts in the case before this Court.
In Lazarre , a bank account was opened at WaMu in 2007 using plaintiff's identity, Fabrice Lazarre. The account was allegedly used for fraudulent purposes with plaintiff Lazarre denying the account was ever his. Chase later acquired WaMu and reported the fraudulent activity to Early Warning who in turn reported same to plaintiff's longstanding bank, Wachovia Bank. In October of 2009, Wachovia Bank placed a financial hold on plaintiff's account.
*759 It was also in October of 2009 that plaintiff first contacted Chase to dispute the report by Chase to Early Warning about the fraudulent activity associated with the WaMu account. Also in October, plaintiff notified Early Warning of its incorrect reporting of this "WaMu account and associated fraudulent activity on its consumer reports." Plaintiff had now informed both Chase and Early Warning the account did not belong to him. One month later, Early Warning contacted Chase about the plaintiff Lazarre and the disputed WaMu account. Early Warning then notified the plaintiff that its consumer report was right because "Chase had confirmed the WaMu account belonged to him and had been used by him to engage in fraudulent activity." Id. at 1323. In response to the information received from Early Warning, plaintiff reiterated his contentions to Early Warning several times after that stating the account was not his. The reply from Early Warning remained the same after each of plaintiff's inquires, " 'its investigation confirmed that the information in [the] consumer report was correct.' " Id.
Plaintiff eventually sought an explanation of Early Warning's reinvestigation procedures on May 25, 2010. On June 2, 2010, Early Warning explained its reinvestigation procedures and "confirmed that Chase, as the 'Furnisher' of information, determined the accuracy of the information reflected in its consumer reports." Id. After plaintiff's recently-opened account with Region's Bank was closed based on Early Warning's consumer report, plaintiff filed suit against Chase and Early Warning. Plaintiff alleged in Count III that Chase violated the Fair Credit Reporting Act, and Chase alleged Count III should be dismissed for lack of subject-matter jurisdiction.
In its motion to dismiss for lack of subject matter jurisdiction, Chase argued the claims in Count III arose from the initial act by WaMu in opening the account and therefore, were subject to the FIRREA administrative exhaustion requirement. Plaintiff responded maintaining his claims pertained only to the conduct by Chase and not to any related acts by WaMu and the FIRREA's exhaustion requirement only barred" those claims asserted against a successor lending institution that are predicated on the wrongful conduct of the failed lending institution." Id. at 1325. Specifically, plaintiff alleged:
Chase violated provisions of the FCRA by consistently concluding the WaMu account was not fraudulent. Lazarre also alleges Chase did not "reasonably investigate" his dispute of the WaMu account or "correctly report" the results of the investigations it did conduct. Lazarre argues his claims arise from these procedural failures by Chase, not from any conduct by WaMu. However, [the court noted] this characterization of Court III ignores that an adjudication on the merits of Lazarre's claims against Chase requires a determination of the legitimacy of the WaMu account.
Id. at 1325-26.
The court found Lazarre's claims as to Chase related to an act of WaMu and thus subject to the administrative exhaustion requirement of FIRREA. Id. at 1327. In reaching its conclusion the court provided this analysis:
While Lazarre asserts that his claims are solely "predicated upon Chase's own wrongful conduct," Lazarre cannot escape the fact that Chase's alleged failure to reasonably investigate Lazarre's dispute of the WaMu account and correctly report the results of the investigations it did conduct are related to an initial act of WaMu-either WaMu's opening of the WaMu account or WaMu's reporting of the WaMu account and associated fraudulent *760 activity to Early Warning. The plain language of section 1821(d)(13)(D) bars judicial review of "any claim relating to any act ... of [a failed lending institution] .... (emphasis added). Because Lazarre's claims against Chase relate to an act of WaMu, they are subject to the administrative exhaustion requirement of section 1821(d).
Id. at 1326-27. Moreover, the court recognized that if it allowed a plaintiff to avoid the FIRREA exhaustion requirement by recharacterizing his claims, the teeth of the exhaustion requirement would be removed. Id. at 1327.
Based on the foregoing and the argument and authorities presented by the defendants in the motions and replies, the Court finds that plaintiff's second cause of action against all three of the named defendants, concerning only the alleged seizure of the property, arises out of the conduct of WaMu and does not fall into the category excluded by the court in Benson of liability based only on post-purchase misconduct by the named defendants. As plaintiff asserts in his complaint, "[t]he actions, first of WaMu, and, thereafter of and by all three Defendants in changing the locks on the doors of the Property, maintaining the Property, paying the taxes on the Property, and such other additional acts as will be detailed at the trial of this matter, have constituted a continuing unlawful seizure without court authorization."
Accordingly, IT IS HEREBY ORDERED that Defendants' Motion to Dismiss Plaintiff's Second Cause of Action Under Rule 12(b)(1) (docket # 10), and Defendant Mortgage Contracting Services, LLC's Motion to Dismiss Pursuant to Rule 12(b)(1) (docket # 24) are GRANTED such that plaintiff's second cause of action is DISMISSED for lack of subject matter jurisdiction as barred by the administrative exhaustion requirement of FIRREA. The dismissal is without prejudice to plaintiff seeking administrative relief if such relief is still available.
It is so ORDERED.

The second cause of action is the only cause asserted against defendant Mortgage Contracting Services, LLC.

Plaintiff's Response and Opposition to Rule 12(b)(1) Motion to Dismiss Filed by Mortgage Contracting Services, LLC, docket # 26 at page 2.

This claim is the subject of Count I of the complaint and not a part of the pending motions to dismiss.

In a footnote appended to this finding, the court explained:
Permitting Tri-State to recharacterize its claims as such would, as appellees note, effectively eviscerate the claims process, because every plaintiff could (and would) simply challenge the FDIC's failure to reverse the failed bank's fraudulent actions rather than challenge the bank's fraudulent actions directly. Thus, in order to effectuate the stated congressional purpose in enacting FIRREA, namely "enabl[ing] the FDIC to dispose of the bulk of claims against failed financial institutions expeditiously and fairly," courts should look to the underlying substance of the challenged events. If plaintiff brings an action against the assets of the failed institution, then FIRREA's exhaustion requirement is applicable regardless of how plaintiff styles its claim.
Id. at 713, n.9 (citation omitted).